THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* LARRY BOUNDS, Defendant-Appellant.

First District (2nd Division) No. 57688

Opinion filed February 26, 1976.

George C. Howard, of Chicago (Allan A. Ackerman, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Patrick T. Driscoll, Jr., and Barry Rand Elden, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE HAYES delivered the opinion of the court:

Defendant-appellant Larry Bounds (hereinafter defendant or Bounds) appeals from his convictions on one count of murder and three counts of attempt murder. Bounds was tried jointly with Theodore Hall before a jury. Each was found guilty on all four counts and each was sentenced to a term of 100 to 150 years on the murder count to be served concurrently with a term of 10 to 20 years on each of the three attempt

murder counts. A third codefendant, Michael Brooks, pled guilty after a severance and was sentenced to a term of 20 to 40 years on the murder charge. In a separate appeal, Hall's conviction was affirmed and his sentence modified. *People v. Hall* (1973), 17 Ill. App. 3d 1, 307 N.E.2d 664.

Defendant was accused of participating in an attempted armed robbery of a tavern located at 856 West 51st Street in Chicago on 28 December 1969. In the course of this armed robbery attempt, shooting broke out. Three tavern patrons were wounded and one, Richard Fuller, was killed.

At trial, seven occurrence witnesses testified. Their testimony established that on 28 December 1969, at about 1:45 or 1:50 a.m., four black men entered the tavern and announced a robbery. Initially, one of the offenders wore a rag-like mask. Ultimately, the faces of all four offenders were visible. The tavern was well lit. One of the offenders was armed with a sawed-off shotgun while the others were armed with handguns. Shooting broke out shortly after the offenders entered the tavern. An occurrence witness, Henry Marek, an off-duty investigator with the Chicago Police Department, drew his snub-nose revolver and fired two shots immediately after the shooting started. One of those shots struck Michael Brooks. Marek believed that his other shot might have hit Theodore Hall. The entire incident was over in a minute or two.

While several occurrence witnesses were able to identify Hall, Marek was the only trial witness who identified Bounds. Since the legal sufficiency of the identification of Bounds is the principal issue on appeal, the trial testimony of Marek must be examined in detail.

On direct examination Marek testified that he was an investigator in the robbery section of the Criminal Intelligence Division of the Chicago Police Department and had been a member of the force for 16 years. After completing his duties on 27 December 1969, he went home, changed to civilian clothing, and went with his wife to the tavern at 856 West 51st Street, arriving there at 12:15 a.m. on 28 December. At 1:50 a.m., while he was sitting at the end of the bar farthest from the entrance to the tavern, he noticed a black man carrying a sawed-off shotgun with a rag over his face, pointing the shotgun at the bartender. He then observed another black man carrying a small handgun standing near a shuffleboard game on the west wall of the tavern; he identified this man as Theodore Hall. Next, he observed a third black man standing next to a telephone, whom he identified as Michael Brooks. After he saw these three offenders, he heard gunshots, whereupon he drew his snub-nose revolver and fired at Michael Brooks. After Brooks fell from Marek's shot, Marek fired at Hall. At this point, Marek's gun jammed.

Marek testified that he then saw Hall run toward the door, after which he saw a fourth offender standing about 30 feet from him. Marek identified this fourth offender as the defendant, Larry Bounds. Bounds was carrying a handgun. Fearful that Bounds would shoot at him, Marek fell to the floor; he heard two or three more shots, after which the offenders fled. Later that morning, at a lineup, Marek identified Hall as one of the offenders.

On 16 February 1970, Marek was shown seven or eight photographs of black males of similar age and physical appearance; one of the photographs was a photograph of Bounds. He identified the photograph of Bounds as a photograph of the fourth offender hereinabove mentioned. Between 28 December 1969 and 16 February 1970, Marek had not seen Bounds in person.

On cross-examination, Marek stated that, at the lineup on 28 December 1969, he had positively identified Hall and had made a tentative identification of one Oscar Peterson. During the time he was at the tavern, Marek stated that he had consumed two or three bottles of beer but that this amount of beer in that span of time did not affect him. Of the four offenders, three carried handguns and one carried a sawed-off shotgun. Those with handguns wore no masks. The bartender first called Marek's attention to the offenders. Within seconds, shooting broke out. Initially, he saw three people with guns.

Still on cross-examination, Marek was questioned about his photographic identification of Bounds on 16 February 1970. He did not know who took the photos. Prior to 16 February 1970, he had seen other photos in connection with the case. Marek denied ever stating that he couldn't see the other two of the three whom he had initially seen (i.e., the two other than the man armed with a shotgun). Defense counsel then read a portion of Marek's testimony at the Coroner's inquest on 5 February 1970 into the death of Richard Fuller. There Marek had stated, "At about 1:50 in the morning, the owner nudged me and said it looks like a robbery. I looked up and saw three men. One had a shotgun, the other two I couldn't see  *  *  *.'" Marek explained that he meant that he could not see what weapons the other two were carrying, if any.

On redirect examination, Marek testified that Peterson was the man with the shotgun and that the other three were Bounds, Hall, and Brooks. The two or three beers he had consumed did not affect his ability to act or observe.

On re-cross-examination, with reference to the photographs he examined on 16 February 1970, Marek testified that, although he could not state that the photos shown to him at trial were the same photographs as those which he had then examined, they were certainly similar.

A copy of Marek's testimony at the Coroner's inquest was made a part of the record on appeal. In addition, Marek's testimony at a pretrial hearing on defendants' motion to suppress identifications is a part of the record on appeal. While there are some apparent inconsistencies between Marek's testimony at trial and his testimony at these earlier proceedings, no direct impeachment efforts were made by defense counsel other than those related above.

During cross-examination of an Officer Barrett, an investigating officer and a State witness, the defense attempted to question the identity of the photographs exhibited in court with those shown to Marek at the time he made the identification of Bounds. In order to do so, the defense tried to show the lack of any reference to such photographs in any of Barrett's police reports. In the presence of the jury, the following exchange occurred between defense counsel and Barrett:

> Q: "Officer, would you point out in that report where it specifically mentions those photos?
>
> A: Do you want me to read it?
>
> Q: Yes.
>
> A: Several photos, one of which was Larry Bounds was shown to the owner, Mr. Charles Evans, owner of the tavern at 856 West 51st Street."

Thereafter, a conference was held in chambers, whereupon the court ruled, over defense objection, that Officer Barrett could read the following language from his police report in the presence of the jury:

> A: "Several pictures [sic], one of which was Larry Bounds were shown to the owner, Mr. Charles Evans, owner of the tavern at 856 West 51st Street and at this time he positively identified the picture of Larry Bounds as being an offender in the above fatal shooting."

Evans was not a witness at trial nor was there any indication as to his availability. But in this manner the jury learned that Evans had made a photographic identification of Bounds as a participant in the robbery.

In his defense, Bounds testified that, at the time of the robbery, he was at a police station at 61st Street and Racine Avenue in Chicago protesting the arrest of his brother on an unrelated charge. This alibi was supported by several relatives and friends as well as by Hall, who also testified that he was then present at the police station at the time of the incident. Although Bounds testified that an Officer Bailey was present in the station at this time, Bailey denied having then seen either Bounds or Hall. On cross-examination, Bounds testified without objection that he knew that he had been implicated in the crime by Michael Brooks, the offender who had been shot by Officer Marek. In its closing

argument, again without objection, the State treated this testimony by Bounds as to Brooks' implication of Bounds as a further identification of Bounds as a participant in the crime.

On this appeal, Bounds contends that the convictions against him cannot be sustained since the testimony of the sole identifying witness at trial was contradictory, false, vague, and uncertain. In support of this, he relies upon the complete transcript of testimony given at the Coroner's inquest upon the body of Richard Fuller. This transcript was not in the record of proceedings at trial, but it is before us as part of the supplemental record on appeal. Bounds also argues that the prosecutor elicited false testimony at trial and compounded this error by a closing argument prejudicially based in part on that testimony.

Defendant's contention that he was not proved guilty beyond a reasonable doubt rests in large part upon apparent inconsistencies, relating to defendant's identification by Marek as a participant in the incident, between Marek's trial testimony and his testimony at the two earlier proceedings. At the Coroner's inquest, Marek testified that he saw three offenders in the tavern. Of these, he stated that he had positively identified Peterson and Hall. He testified that he could not identify the man carrying the sawed-off shotgun. Marek made no mention of an offender facing him with a gun at the time that his (Marek's) gun jammed. The testimony as to Marek's inability to see whether two of the offenders had guns was previously mentioned. Finally, he stated that he saw a photograph of Bounds about a week after the incident.

In contrast to his testimony at the inquest, Marek at trial testified that he saw four offenders in the tavern; that he had positively identified Hall but had only tentatively identified Peterson; that Peterson was the offender with the shotgun; that Bounds was pointing a gun at him when his own gun had jammed; and that he didn't see a photograph of Bounds until 16 February 1970. Defendant also notes that, since Marek identified Brooks as an offender prior to trial, Brooks, Hall, and Peterson must have been the three offenders whom Marek testified at the Coroner's inquest that he had seen.

While there are apparent inconsistencies in Marek's testimony, in only one instance was Marek given an opportunity to explain the discrepancy. In that instance, Marek cogently explained that, while initially he could see the other two of three offenders in the tavern (*i.e.*, the two other than the man with the shotgun), he could not at first see what weapons they carried, if any.

■■ Absent a proper foundation for impeachment in which the witness is first asked whether he had previously made a particular statement under given circumstances at a given time and place and is later

allowed to explain any apparent discrepancy between that statement and his statement at trial, impeaching prior inconsistent statements are inadmissible. (*People v. Sanders* (1974), 56 Ill. 2d 241, 306 N.E. 2d 865; *People v. Johnson* (1970), 123 Ill. App. 2d 69, 259 N.E.2d 621.) Moreover, in the present case, the prior apparently inconsistent statements (other than the single instance just mentioned) were never made a part of the trial record. Despite the fact that they are before us here as part of the record on appeal, we may not consider such statements since they are *dehors* the trial record. *People v. Rogers* (1963), 26 Ill. 2d 599, 188 N.E.2d 22; *People v. Brown* (1954), 3 Ill. 2d 623, 122 N.E. 2d 153.

■■ Next, defendant argues that the identification which Marek made of defendant's photograph was improper, citing *Simmons v. United States* (1968), 390 U.S. 377, 19 L. Ed. 2d 1247, 88 S. Ct. 967, and *People v. Holiday* (1970), 47 Ill. 2d 300, 265 N.E.2d 634. He argues that, if Marek first saw Bounds' photograph on 16 Febraury 1970, as he testified at trial, then a photographic identification was improper since Bounds was in custody at that time on another charge and was available for lineup identification. However, nothing in the record demonstrates that the photographic identification was so impermissibly suggestive as to give rise to a substantial likelihood of irreparable misidentification. In addition, Marek had the opportunity at the scene of the robbery to observe and to fix Bounds' face and features in his memory. This provides an independent basis for Marek's in-court identification of Bounds. (See *People v. Blumenshine* (1969), 42 Ill. 2d 508, 250 N.E.2d 152.) Under the totality of the circumstances, the fact that a lineup was not held in the identification of Bounds is not reversible error. *People v. Holiday.*

■■ The final ground upon which Bounds attacks Marek's identification is that the identification was vague, doubtful, confused, and uncertain. The cases cited by defendant in support are not in point. It is well settled that an identification by one credible witness is sufficient to sustain a conviction. (*People v. Jones* (1975), 60 Ill.2d 300, 325 N.E.2d 601; *People v. Fultz* (1975), 32 Ill. App. 3d 317, 336 N.E.2d 288.) That other witnesses were unable to make an identification is a factor to be considered by the jury in weighing the evidence. Our review of the record convinces us that Marek's identification of Bounds was neither vague, doubtful, confused, nor uncertain and that the jury could have properly relied upon his testimony in order to convict defendant. In view of this conclusion, the testimony of Officer Barrett as to Evans' photographic identification of defendant and the testimony of defendant on cross-examination that he knew he had been implicated by Brooks

constitute merely cumulative evidence as to defendant's identification. In addition, there was no objection to defendant's testimony, and it was defense counsel himself who introduced the matter of references to photographs in Officer Barrett's police report. Hence, the error, if any, as to defendant's testimony was waived, and defendant cannot complain about Officer Barrett's testimony which was initiated by his own counsel.

■■ Defendant's second group of contentions concern alleged instances of prosecutorial misconduct. First, defendant contends that the prosecutors solicited or encouraged "uncorrected" false testimony in their examination of Officer Marek. The reference is to the trial statements of Officer Marek which were inconsistent with prior statements he had made. The thrust of the contention is that such trial statements constitute perjury, the subornation of which by the State was reversible error. But in order for the testimony to constitute perjury which is reversible error, the testimony must be shown " "* * * by clear, convincing and satisfactory evidence to have been, not false merely, but to have been wilfully and purposely falsely given * * *.' " *People v. Lewis* (1961), 22 Ill.2d 68, 71, 174 N.E.2d 197, quoting from *Shammas v. Shammas* (1952), 9 N.J. 321, 88 A.2d 204.[1] Defendant's allegations of perjury here fall far short of clear and convincing evidence. First, except for the single instance which was explained, the alleged inconsistencies in Marek's testimony are *de hors* the trial record; and second, Marek was not given an opportunity to explain these inconsistencies. Mere inconsistencies in Marek's trial testimony—for example whether his lineup identification of Peterson had been tentative or positive—do not as such establish perjury. At most, an issue of credibility is raised for the jury. We conclude that there is no merit to Bounds' contention that the State suborned perjury in its case-in-chief.

■■ Finally, defendant argues that the State in closing argument made prejudicial and improper remarks relative to the matter of Evans' photographic identification of defendant and to Brooks' implication of

---

[1] We are aware that, in *People v. Bracey* (1972), 51 Ill.2d 514, 283 N.E.2d 685, our Supreme Court discarded the further language quoted from *Shammas* in *Lewis* that the testimony in question must also be shown by clear, convincing and satisfactory evidence " "* * * to have been material to the issue tried and not merely cumulative but probably to have controlled the result. * * *" " (22 Ill. 2d 68, 71.) It did so in order to adopt instead the "unless harmless beyond a reasonable doubt" test of *Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed 2d 705, 87 S. Ct 824. *Bracey*, however, continues to recognize that, in order to constitute perjury, the subornation of which by the State is reversible error, the testimony of the witness must still be shown to have been perjured by clear and convincing evidence. See *Napue v. Illinois* (1959), 360 U.S. 264, 3 L. Ed. 2d 1217, 79 S. Ct. 1173.

338

Bounds. First, we note that during the State's closing argument on these points, defense counsel at no time objected. Hence, any error which may have been committed is waived. (*People v. Bambulas* (1969), 42 Ill. 2d 419, 247 N.E.2d 873.) Moreover, our review of the evidence on the record convinces us that these comments were not so unduly prejudicial as to deny defendant a fair trial. Similarly, the failure to give an alibi instruction is not error since defendant did not tender one.

■■ Although defendant does not argue any further points, we may here take judicial notice that in *People v. Hall* (1973), 17 Ill. App. 3d 1, 307 N.E.2d 664, this court held that Hall's 100- to 150-year sentence for murder was excessive and reduced his sentence on the murder count to 35 to 80 years. Prior to the offenses in question here, Bounds had been convicted only of certain misdemeanors. Pursuant to our power under Supreme Court Rule 615(b)(4), we deem it appropriate to take the same action here as did the court in *Hall*. Hence, we reduce Bounds' sentence on the murder count to a minimum of 35 years and a maximum of 80 years.

Accordingly, the judgments of the Circuit Court of Cook County for attempt murder are affirmed. The judgment for murder is also affirmed, but the sentence of 100 to 150 years is reduced to a term of from 35 to 80 years.

Judgments affirmed as modified.

STAMOS, P. J., and LEIGHTON, J., concur.